# WALWORTH *v.* HARRIS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

No. 148. Submitted January 7, 1889. — Decided February 4, 1889.

The lien upon a crop of cotton, created by a statute of Arkansas which gives a lien to a landlord upon the crop grown on demised premises to secure accruing rent, is, when the cotton comes into the hands of a broker in New Orleans, under consignment from the lessee, and without knowledge of the lien on the consignee's part, subordinated to the consignee's lien for advances, arising under the laws of Louisiana.

THE court stated the case in its opinion as follows:

Sarah Walworth, the appellant in the present case, and John B. Walworth, who died pending the suit, said Sarah being now his executrix, with many other persons, are complainants in a bill in chancery, brought in the Circuit Court of the United States for the Eastern District of Arkansas, against Joseph L. Harris, John M. Parker, Z. T. Carlton, Sarah E. Bryan, and others.

The object of the bill was to enjoin Carlton from proceeding to sell property conveyed to him by a deed of trust to secure certain debts due by the Bryans to J. L. Harris & Co. Lemuel C. Bryan and Joel E. Bryan were in business at Point Chicot, in Chicot County, Arkansas, under the partnership designation of L. C. Bryan & Bro. The main occupation was selling goods and buying cotton, but they also had several cotton plantations under their control. Among others they had leased from the heirs of Horace F. Walworth a farm at Point Chicot, for five years, at a rent of $5500 a year, running from January 1, 1879, to January 1, 1884. Although the lease was executed in the name of Lemuel C. Bryan alone, it was for the benefit of the firm of Bryan & Bro., and it went into the general partnership business.

Joseph L. Harris and John M. Parker, trading as partners under the firm name of J. L. Harris & Co., cotton brokers in the city of New Orleans, were the correspondents of Bryan & Bro., and to them the latter firm transmitted the cotton raised and purchased by them in Arkansas.

During the pendency of this lease, to wit, on December 9, 1881, Bryan & Bro. being indebted to Harris & Co., and desiring further accommodations and advancements from them, made a deed of trust to Z. T. Carlton, of the county of Chicot, in Arkansas, in which they conveyed to him as trustee substantially all their property in the State of Arkansas, and all the cotton or other products raised or gathered during the year 1881 on the plantations and tracts of land described, with about 250 bales of cotton, in seed lint and bales, on the Point Chicot plantation, leased from the heirs of Walworth. The

purpose of this conveyance was declared to be to secure the payment of a debt of $35,000, evidenced by notes of Bryan & Bro., dated at New Orleans, La., December 9, 1881, drawn to the order of J. L. Harris & Co., and payable at their office in that city; also any advance in addition to said notes which Harris & Co. might make to Bryan & Bro., with various other agreements not material to be mentioned here.

The bill of the complainants, except the heirs of Walworth, consists of allegations that Harris & Co. had undertaken that out of the proceeds of the property conveyed by this deed of trust to Carlton these creditors should be paid various sums due to them. The heirs of Walworth in addition to this set up that, by virtue of the lease made between them and Bryan & Bro., they had a lien on the cotton raised each year on the Point Chicot plantation for the amount of the rent, $5500 per annum; and further, that by virtue of the laws of Arkansas they had the landlord's lien for rent for the same sum on the cotton raised on the plantation. They also alleged that this cotton, the rent being unpaid, came to the hands of J. L. Harris & Co., who disposed of it, but that they were aware of the existence of such lien and were bound by it.

The Circuit Court, after a hearing on the bill, answer, replication, and evidence, dismissed it, and from that decree only the heirs of Walworth take this appeal, and they only as to the question of their right to recover the rent for one year by virtue of a lien on the cotton which came to the hands of Harris & Co. from the Bryans. All the other questions, therefore, which were raised in the case, as it was originally heard and tried, are eliminated from its consideration in this court.

The lien here asserted seems to be founded upon expressions contained in the contract of lease, and upon the statute of Arkansas concerning the lien of a landlord. The only clause in the lease referring to a lien is the following: "And it is further understood that the lessor shall have his lien on the crop for the security and payment of his rent, as set forth in this lease." This reference to what is set forth in the lease means the amount of the rent and the time of its payment, and the language, that "the lessor shall have his lien on the

crop," evidently refers to the lien which the statute gives. So that, after all, it is the lien given by the statute of Arkansas which is the one sought to be enforced here.

The text of that statute is given below in the opinion.

*Mr. J. S. Whitaker* and *Mr. D. H. Reynolds* for appellants.

By the laws of Arkansas, the landlord's lien is a charge upon the crop for the rent, and if the purchaser, or mortgagee, has notice of the lien for rent, he takes subject to the lien. Knowledge of the tenancy is sufficient notice to the purchaser or mortgagee of the lien for rent. *Smith* v. *Meyer*, 25 Arkansas, 609; *Volmer* v. *Wharton*, 34 Arkansas, 691. And it is not necessary in Arkansas to record a lease to give a landlord a lien on the crop for rent, as actual knowledge of the tenancy coupled with the lien for rent given by law is sufficient notice to bind parties who deal with the lessee, or acquire an interest in the crop within the period of limitation. *Smith* v. *Meyer*, *supra.*

The landlord's lien is superior to the lien of the mortgagee and continues for six months after the rent becomes due, and he may pursue the produce of the rented premises, or the proceeds thereof in the hands of parties having notice of the lien, at any time within the six months. *Meyer* v. *Bloom*, 37 Arkansas, 43; *Buck* v. *Lee*, 36 Arkansas, 525; *Watson* v. *Johnson*, 33 Arkansas, 737; *King* v. *Blount*, 37 Arkansas, 115. These authorities show that if J. L. Harris & Co., by virtue of their deed of trust, or otherwise, acquired an interest in the crop of cotton raised on Point Chicot plantation in 1881, and at the time had a knowledge of the tenancy of Bryan, from whom they acquired such interest or lien, they acquired subject to the lien for rent.

The removal into Louisiana did not change the rights of the parties, or change the rule for ascertaining and enforcing them. They might increase the difficulty of recovering the property, or the proceeds from them by the removal, but could not deprive the landlords of their lien or give themselves a better claim to it. Nor would the supposed advan-

tage acquired by them, by the removal, give a solid basis on which to rest a claim that the laws of Arkansas giving the lien have no extraterritorial force, and that the removal to Louisiana had brought the cotton within the influence of a lien by statute of that State, that by comity could not be displaced, and thereby give them as it were a new and better right to retain the cotton, or its proceeds against the lien under the laws of Arkansas for the rent. The courts have frequently been called upon to determine the right of parties resulting from a conflict of laws, and it seems to be conceded that one State or nation is not required by its courts through comity to deprive its citizens of a right under its laws by enforcing the laws of another State where the parties before the court come to their interest or claim, in or to the property, by regular course of trade without notice of the claims or rights of others than those from whom they acquire title or interest. But I have failed to find a case where the courts have interposed the shield of comity to protect a party in the possession of property where he has been instrumental in removing the property from a jurisdiction where there were liens in favor of himself and others, to a State where a new lien might attach and for his benefit. *See Bank of Augusta* v. *Earle*, 13 Pet. 519.

As a general rule a personal contract with attendant privileges and effects when made in another State will be enforced in Louisiana upon a movable according to the *lex loci contractus*, provided such enforcement be not contrary to its policy, and does not violate the order of priority established by them, and does not injure the rights of its own citizens, and provided further that the *lex fori* gives the remedy asked for. *Tyree* v. *Sands*, 24 La. Ann. 363; *Chaffe* v. *Heyner*, 31 La. Ann. 594.

And in that State the landlord has a privilege on the growing crop of the year to secure his rents, and this privilege is first except as to laborers' and overseers' wages. *Knox* v. *Booth*, 19 La. Ann. 109; *Duplantier* v. *Wilkins*, 19 La. Ann. 112; Rev. Stat. La. § 2873.

The laws of Louisiana and Arkansas being the same in effect in relation to the lien of landlords for rent, this lien may be

enforced in either of the States.    *Cox* v. *Morrow,* 14 Arkansas,
603, 610; *Leonard* v. *Columbia Steam Nav. Co.,* 84 N. Y. 48,
55; *Morris* v. *Chicago, Rock Island, &c. Railway,* 65 Iowa,
727; *Knight* v. *West Jersey Railroad,* 108 Penn. St. 250.    See
also *Ellett* v. *Butts,* 19 Wall. 544; *Canada Southern Railroad*
v. *Gebhard,* 109 U. S. 527, 536.

*Mr. F. W. Compton* and *Mr. Thomas J. Semmes* for
appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

There is no question that, under the laws of Arkansas, there
existed a lien on some of the cotton transmitted by Bryan &
Bro. to the defendants, Harris & Co., while that property
remained in the State of Arkansas; and it is attempted to aid
the argument in this case, which holds Harris & Co. liable for
that lien on the cotton received by them, by the allegation
that they knew that it came from the Point Chicot plantation,
and knew the rent was unpaid, and, therefore, had knowledge
of the existence of the lien.    This knowledge, however, or
even notice, is not sustained by the evidence.

The plaintiffs, in their bill, allege that Harris & Co. must
have known of this lien, for two reasons: First, because they
had paid the rent for two previous years to the heirs of Wal-
worth; and, second, because the lease between the heirs of
Walworth and Bryan & Bro. had been in their hands for a
short time, so that they must be held to have known its con-
tents.

The bill is sworn to, and the answer is sworn to, with no
waiver of an answer under oath, and according to chancery
practice the answer of Joseph L. Harris, of the firm of J. L.
Harris & Co., so far as it is responsive to these allegations,
must be taken as evidence.    In regard to the payment of the
rent for the two years mentioned, he says that he simply paid
it upon the order of Bryan & Bro., out of funds of theirs in
his hands, as he would have paid any other order of theirs,
and without any knowledge as to the nature, character or

extent of the lien, or that the rent was a lien on cotton in his hands. As regards the possession of the lease referred to, he says that they (Harris & Co.) did, at one time, in the year 1880, which is over a year previous to the crop on which the lien is now claimed, have this lease in their possession; that it was deposited with them by one Whitaker, who claimed to have an interest in the lease as collateral security for a loan of $600; and that Whitaker having soon thereafter paid the same, it was returned to him without any further attention on their part.

This statement is confirmed by the answer, which is also under oath, of Joel E. Bryan, the surviving partner of Byran & Bro., the other brother, Lemuel, having died before the trial. He says that L. C. Bryan & Bro. shipped of the cotton grown on the Point Chicot plantation in the year 1881, 467 bales, all of which was shipped to their own account to J. L. Harris & Co., to be by them sold as cotton factors, and the proceeds applied to the payment of advances made to their firm by Harris & Co., and, referring evidently to the question of the lien stated in the bill to be impressed on said cotton, says that if it was impressed with anything beside the shipping brand of his firm he did not see it; that the whole of said cotton belonged to the firm of Bryan & Bro., taken in the regular course of business, and that the last shipment, made on the 19th day of December, 1881, was sold a few days thereafter, and an account of sales rendered by Harris & Co.

There is no evidence from any quarter contradicting these sworn answers of J. L. Harris and Joel E. Bryan, and we, therefore, think that it is not established that Harris & Co. knew or had notice of any lien in favor of the Walworth heirs for the rent upon the cotton received by them in the last days of these transactions.

It is also apparent, from all this testimony, that the cotton was shipped by Bryan & Bro. to Harris & Co. at New Orleans, as the property of the former, and was received and for the first time came under the control of the latter on landing at that place; and that they received it without any other obligation to account for the rent of the Point Chicot plantation, or

any other lien upon it, except such as would arise from the fact that such a lien existed in Arkansas as between Bryan & Bro. and the Walworth heirs.

The laws of the two States differ from each other on this subject. The statute of Arkansas is found in the Revised Statutes of that State, of 1884, in the following words:

"SEC. 4453. Every landlord shall have a lien upon the crop grown upon the demised premises in any year for rent that shall accrue for such year, and such lien shall continue for six months after such rent shall become due and payable." Mansfield's Digest Stats. Ark. 1884.

This was in force when these transactions took place.

There are also other provisions for the enforcement of this lien, which it is not necessary to embody here.

The Revised Code of Louisiana, arts. 2705 and 2709, limits the right of pledge of the lessor of real estate to the "movable effects of the lessee, which are found on the property leased," and "in the exercise of this right the lessor may seize the objects which are subject to it, before the lessor takes them away, or within fifteen days after they are taken away, if they continue to be the property of the lessee, and can be identified." By the Session Act of 1874, page 114, it is enacted as follows:

"SEC. 2. That when any merchant, factor, or other person has advanced money, property, or supplies on cotton, sugar, or other agricultural products, and the same has been consigned to him by ship, steamboat, vessel, railroad, or other carrier, the said agricultural products shall be pledged to the consignee thereof from the time the bill of lading thereof shall be put in the mail or put into the possession of the carrier for its transmission to the consignee."

It is not necessary to hold that the right of Harris & Co. to this cotton was vested in them on the giving of the bill of lading, or putting on board of a railroad or steamboat, but it is sufficient to hold that when they received it in New Orleans they received it under such rights and limitations as the laws of Louisiana conferred upon them in that regard.

The question here presented of the conflicting rights of

parties claiming property under the laws of two different States, each of which sustains the claims of the party residing in it, is not a new one in this court. The case of *Green* v. *Van Buskirk*, 5 Wall. 307, seems to decide the present one by the principles which it lays down and the analogy of the two cases in regard to the facts. That case was twice before this court for consideration.

It appeared that Bates, a citizen of the State of New York, was the owner of certain safes, which he sent from that State to the city of Chicago, in the State of Illinois. On the 3d day of November, 1857, Bates executed and delivered, in the city of New York, to Van Buskirk and others, a chattel mortgage on these safes to secure an existing debt. On the 5th day of the same month, Green also a creditor of Bates, sued out a writ of attachment in the proper court of Illinois, and caused it to be levied upon these safes in Chicago as the property of Bates. No record had been made at this time of; the mortgage in the State of Illinois, nor had the possession of the property been delivered under it. Green recovered a judgment in the attachment suit, and had the safes sold in satisfaction of his debt. He was afterwards found in New York, of which State all three of the parties named were citizens, and was there sued by Van Buskirk for the value of the safes. Green pleaded the proceedings in the Illinois courts in bar of the action, but this plea was overruled. The decision was affirmed by the Court of Appeals of New York, from which judgment Green took a writ of error to this court. It first came under consideration here on a motion to dismiss for want of jurisdiction; but it was held that the question of the right of Green to seize the property under his attachment must be determined by the law of Illinois, where the property was when so seized, and not by the law of New York, and that the Court of Appeals had refused to give to the judgment of the Illinois court the full faith and credit to which it was entitled as a judicial proceeding of the courts of that State.

The inquiry of course involved more or less the question of the effect of those proceedings, but as the case was only before the court on a motion to dismiss for want of jurisdiction, it

had. to come up afterwards to be heard on its merits. On the *motion* the court considered very fully, the much controverted principle as to the extraterritorial effect, of laws affecting the title or liens upon the property in one State when that property was carried away or became the subject of litigation in another State; and while it was seen that in many cases it had been held that a court of one State would give effect to the law of domicil of another State, it was said: "But after all, this is a mere principle of comity between the courts, which must give way when the statutes of the country, where property is situated, or the established policy of its laws prescribe to its courts a different rule. The learned commentator, already referred to, [Story on Conflict of Laws, § 390,] in speaking of the law in Louisiana, which gives paramount title to an attaching creditor over a transfer made in another State, which is the domicil of the owner of the property, says: 'No one can seriously doubt that it is competent for any State to adopt such a rule in its own legislation, since it has perfect jurisdiction over all property, personal as well as real, within its territorial limits. Nor can such a rule, made for the benefit of innocent purchasers and creditors, be deemed justly open to the reproach of being founded in a narrow or selfish policy.' Again, he says: 'Every nation, having a right to dispose of all the property actually situated within it, has (as has been often said) a right to protect itself and its citizens against the inequalities of foreign laws, which are injurious to their interests.' "

The court also cited with approval the following language (§ 388) from the same authority: "The municipal laws of a country have no force beyond its territorial limits, and when another government permits these to be carried into effect within her jurisdiction, she does so upon a principle of comity. In doing so, care must be taken. that no injury is inflicted upon her own citizens, otherwise justice would be sacrificed to comity. . . . If a person sends his property within a jurisdiction different from that where he resides, he impliedly submits it to the rules and regulations enforced in the country where he places it." See also *Olivier* v. *Townes*, 2 Martin (N. S.) 93; *Denny* v. *Bennett*, 128 U. S. 489.

When the case of *Green* v. *Van Buskirk* again came before this court on its merits, (7 Wall. 139,) Mr. Justice Davis, in delivering the opinion, said, in reference to this question of the conflict of rights under the laws of different States, which were themselves in conflict:

"It is a vexed question on which learned courts have differed; but after all there is no absolute right to have such transfer respected, and it is only on a principle of comity that it is ever allowed. And this principle of comity always yields when the laws and policy of the State where the property is located have prescribed a different rule of transfer with that of the State where the owner lives." p. 151.

The same principle is reasserted in *Hervey* v. *Rhode Island Locomotive Works*, 93 U. S. 664. That was a case where the Rhode Island company had delivered to Conant & Co., who were contractors on a railroad in Illinois, a locomotive engine, under an instrument in writing which this court construed to be a lease. By the laws of Illinois, to which this engine was carried, such lease or title, whatever it may have been, which the locomotive company insisted that they had retained in the property, was of no avail as against subsequent creditors when the property was found in that State, unless it was properly recorded there. No such record being made of the instrument under which Conant & Co. held it, the engine was seized by attachment against that firm and sold to Hervey, the plaintiff in error in this court. In the following language, taken from the opinion in that case, the doctrine is reiterated that the question must be determined by the laws of Illinois where the property was found and sold, and not by the laws of Rhode Island where the lease or instrument of conveyance was made:

"It was decided by this court in *Green* v. *Van Buskirk*, 5 Wall. 307, 7 Id. 139, that the liability of property to be sold under legal process, issuing from the courts of the State where it is situated, must be determined by the law there, rather than that of the jurisdiction where the owner lives. These decisions rest on the ground that every State has the right to regulate the transfer of property within its limits, and that whoever sends property to it impliedly submits to the regula-

tions concerning its transfer in force there, although a different rule of transfer prevails in the jurisdiction where he resides. He has no absolute right to have the transfer of property, lawful in that jurisdiction, respected in the courts of the State where it is found, and it is only on a principle of comity that it is ever allowed. But this principle yields when the laws and policy of the latter State conflict with those of the former." p. 671.

The principle here asserted, which is clearly applicable to the case before us, is supported by reference to authorities in those opinions which we think are conclusive. At all events, the cases themselves are conclusive upon this court, and upon the rights of the parties to this suit.

The decree of the Circuit Court dismissing the bill is therefore,

*Affirmed*